STATE OF WEST VIRGINIA

*v.*

MORRIS S. WENDER

(No. 12347)

Submitted January 19, 1965.     Decided April 13, 1965.

414

*C. Donald Robertson,* Attorney General, *William F. Carroll,* Assistant Attorney General, for plaintiff in error.

*Pat R. Hamilton,* for defendant in error.

BROWNING, PRESIDENT:

Morris S. Wender, the defendant, was arrested on five several warrants issued by a justice of the peace of Fayette County, West Virginia, on April 22, 1963, charging him with the sale and delivery of cigarettes at retail for a price below the minimum established by Regulation CSA-2 promulgated by the Tax Commissioner of the State of West Virginia. The defendant entered pleas of not guilty to each complaint but was found guilty by the justice and fined one hundred dollars and costs on each offense. An appeal was taken to the Circuit Court of Fayette County and, on appeal, the defendant demurred to the charges against him on the ground that Code, 47-13-13, as amended, "The Cigarette Sales Act", on which the charges were based, is unconstitutional. The demurrer was sustained by

the Circuit Court of Fayette County and, on application of the state, this Court granted a writ of error and supersedeas on June 22, 1964.

Chapter 10, Acts of the Legislature, Regular Session, 1961 (Code, 47-13, as amended), created what is known as "The Cigarette Sales Act". Section 3 thereof provides:

"It shall be unlawful and a violation of this article:

" (a) For any retailer or wholesaler with intent to injure competitors or destroy or substantially lessen competition:

" (1) To advertise, offer to sell, or sell, at retail or wholesale, cigarettes at less than cost to such a retailer or wholesaler, as the case may be.
" . . ."

The section then provides that any violation of the above is a misdemeanor punishable by a fine of not more than five hundred dollars for each such offense. Section 2, subsection (11) (a) provides:

"The term 'cost to the retailer' shall mean the 'basic cost of cigarettes' to the retailer plus the 'cost of doing business by the retailer', as evidenced by the standards and methods of accounting regularly employed by him in his allocation of overhead costs and expenses, paid or incurred, and must include, without limitation, labor (including salaries of executives and officers), rent, depreciation, selling costs, maintenance of equipment, delivery costs, all types of licenses, taxes, insurance and advertising: *Provided,* That any retailer who, in connection with the retailer's purchase, receives not only the discounts ordinarily allowed upon purchases by a wholesaler but also shall, in determining 'costs to the retailer', pursuant to this subsection, add the 'cost of doing business by the wholesaler', as defined in section two, subparagraph ten of this section, to the 'basic cost of cigarettes' to said retailer, as well as the 'cost of doing business by the retailer'.

" (b) In the absence of the filing with the commissioner of satisfactory proof of a lesser or higher cost of doing business by the retailer making the sale, the 'cost of doing business by the retailer'

shall be presumed to be eight per centum of the 'basic cost of cigarettes' to the retailer.

"(c)    In the absence of the filing with the commissioner of satisfactory proof of a lesser or higher cost of doing business, the 'cost of doing business by the retailer', who, in connection with the retailer's purchase, receives not only the discounts ordinarily allowed upon purchases by a retailer but also, in whole or in part, the discounts ordinarily allowed upon purchases by a wholesaler, shall be presumed to be ten per centum of the sum of the 'basic cost of cigarettes' and the 'cost of doing business by the wholesaler'."

Section 2, subsection (9) defines "Basic cost of cigarettes" as the invoice cost of the cigarettes to the retailer or the replacement cost whichever is lower, less all trade discounts except the customary discounts for cash plus the value of any tax stamps if not included by the manufacturer in his list price.

Statutes such as the one under consideration have been enacted in a majority of the states, beginning in South Carolina in 1902. The bulk of them, however, apparently stemmed from the depression of the early 1930's, were given impetus by the Robinson-Patman Act of 1936, 15 U.S.C.A., § 13, et seq., and were intended to alleviate the situation existing in many fields of competition by eliminating the tendency of certain individuals and corporations to sell below cost in order to force their competitors out of business. The constitutionality of these statutes has been tested many times, the majority of the courts upholding their validity under the police power of the state and, concomitantly, that such statutes are not violative of the due process and equal protection clauses of the federal and of their respective state constitutions. *Borden Co.* v. *Thomason,* 353 S. W. 2d 735 (Mo., 1962); *Rocky Mountain Wholesale Co.* v. *Ponca Wholesale Mercantile Co.,* 360 P. 2d 643 (N. M., 1961); *Simonetti, Inc.* v. *Gallion,* 132 So. 2d 252 (Ala., 1961); *State* v. *Consumers Warehouse Mkt.,* 329 P. 2d 638 (Kan., 1958); *Louisiana Wholesale Dist. Ass'n.* v. *Rosenzwieq,* 36 So. 2d 403 (La., 1948); *Moore* v. *Northern Ky. Independent F. D. Ass'n.,* 149 S. W. 2d 755 (Ky., 1941);

*State* v. *Sears*, 103 P. 2d 337 (Wash., 1940); *Wholesale Tobacco Dealers Bureau of So. Cal.* v. *Nat'l Candy & Tobacco Co.*, 82 P. 2d 3 (Cal., 1938); *Nebbia* v. *N. Y.* (1933), 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A.L.R. 1469. Other decisions are collected and analyzed in 128 A.L.R. 1126; 118 A.L.R. 506; 57 Yale L. J. 391 and 21 Va. L. R. 336. The general principle derived from these cases is that the prohibition of sales below cost lies within the police power of the state and the legislature is vested with a wide discretion in determining whatever economic policy may be deemed to promote the public welfare, which policy the courts are powerless to override provided the laws passed bear a reasonable relationship to the legislative purpose and are neither arbitrary nor discriminatory.

While conceding the soundness of the general rule, the courts in the following cases have struck down similar statutes on the ground that the act under consideration was discriminatory, vague, bore no reasonable relationship to the legislative purpose or concerned an item or commodity not "affected with a public interest". *Williams* v. *Hirsh* (Ga., 1955), 87 S. E. 2d 70; *Gambone* v. *Commonwealth* (Pa., 1954), 101 A. 2d 634; *Harris* v. *Duncan* (Ga., 1951), 67 S. E. 2d 692; *Lane Distributors* v. *Tilton* (N. J., 1951), 81 A. 2d 786; *Serrer* v. *Cigarette Service Co.* (Ohio, 1946), 74 N. E. 2d 841; *Commonwealth* v. *Zasloff* (Pa., 1940), 13 A. 2d 67; *Great A & P Tea Co.* v. *Ervin* (1938), 23 F. Supp. 70.

In the instant case it will be noted that the warrants obtained against the defendant do not charge the defendant with having sold cigarettes at less than cost as defined by the statute but only with having sold cigarettes below the minimum price prescribed by the Regulation CSA-2 promulgated by the tax commissioner and do not allege the intent with which such sales were made, but in view of our ultimate holding that the act is unconstitutional we need not discuss the sufficiency of the warrants as charging any crime under the act. It was stipulated by the defendant that sales were made below the prescribed price but it was

not stipulated that such sales were below his cost as defined by statute.

Adverting to Code, 47-13-11 (a), as amended, heretofore quoted, the cost to the retailer is defined as the "basic cost of cigarettes" plus the "cost of doing business by the retailer", as evidenced by a numerous array of expenses constituting "overhead costs" and provides "That any retailer who, in connection with the retailer's purchase, receives not only the discounts ordinarily allowed upon purchases by a wholesaler *but also shall, in determining 'costs to the retailer', pursuant to this subsection, add the 'cost of doing business by the wholesaler', as defined in section two, sub-paragraph ten of this section, to the 'basic cost of cigarettes' to said retailer, as well as the 'cost of doing business by the retailer'.*" (Italics supplied.) This proviso is incomprehensible. Subsection (b) provides that in the absence of filing of proof of a lesser or higher cost of doing business the "cost of doing business by the retailer" shall be presumed to be eight per centum of the "basic cost of cigarettes". Subsection (c) then provides that, in the absence of proof of a lesser or higher cost the "cost of doing business by the retailer" who received not only the discounts ordinarily allowed upon purchases by retailers but also in whole or in part the discounts ordinarily allowed by a wholesaler shall be presumed to be ten per centum of the "basic cost of cigarettes" and the "cost of doing business by the wholesaler". Section 7 of the act provides that a retailer may sell cigarettes "at a price made in good faith to meet the price of a competitor who is selling the same article at cost to him as a retailer." The above provisions are so vague and uncertain as to prevent any ordinary retailer from determining the price at which he may legally sell cigarettes without contravening the provisions of the statute. He must therefore rely upon the prices fixed, arbitrarily or otherwise, by the state tax commissioner as apparently was done in Regulation CSA-2, the basis for which is not shown by this record. Upon this ground alone the quoted provisions of the statute under consideration would fall.

In *General Electric Co. v. A. Dandy Appliance Co.*, 143 W. Va. 491, 103 S. E. 2d 310, this Court held unconstitutional and void that portion of the so-called "Fair Trade Act" of this state, Code, 47-11-6, as amended, which provided that the seller of trade-marked items at a price less than that stipulated by the manufacturer was a violation of the act whether or not the seller was a party to the stipulated price contract. The Court, after reviewing several cases from other jurisdictions in which such a provision was upheld, quoted with approval this language from the case of *Cox v. General Electric Co.*, 211 Ga. 286, 85 S. E. 2d 514, 519: ". . . We are here, however, dealing with the statutes of this State and with the question of whether or not they violate the Constitution of the State of Georgia. What the courts of other States have decided is not controlling, and this is one of the few powers left to States to decide for themselves regardless of what the Supreme Court of the United States may or may not have decided. We are also familiar with the modern trend to allow the government to encroach more and more upon the individual liberties and freedoms. So far as we are concerned, we will not strike down the Constitution of our State for this purpose; neither will we follow the crowd. The scheme described in the petition now under consideration permits a manufacturer, under the guise of protecting his property rights in a trade name and trade-mark, to control the price of his product down through the channels of trade into the hands of the ultimate consumer, and into the hands of persons with whom he has no contractual relation whatever. This statute clearly violates the provisions of the due process clause of the Constitution of the State of Georgia." In *Harris v. Duncan*, 67 S. E. 2d 692 (Ga., 1951), the Supreme Court of Georgia struck down a milk control law establishing a minimum price for the selling of milk though recognizing that the Supreme Court of the United States in *Nebbia v. New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed., 940, had upheld a New York milk law as not being violative of the due process and equal protection clauses of the Federal Constitution, the Court stating that "Before the General Assembly can authorize

price fixing without violating the due process clause of our Constitution, among other requirements, it must be done in a business or where property involved is 'affected with a public interest,' and the milk industry does not come within that scope." In a subsequent case of *Williams* v. *Hirsch,* 87 S. E. 2d 70, the Georgia Court again struck down an act similar to that involved here on the ground that the business of selling cigarettes is not one affected with a public interest and hence the act was offensive to the due process clause of the Georgia Constitution. We are in agreement with the Georgia Court that the business of selling cigarettes is not one "affected with a public interest" and that "The Cigarette Sales Act" under consideration is violative of Article III, Section 10, of the Constitution of West Virginia, which provides that "No person shall be deprived of life, liberty, or property without due process of law, and the judgment of his peers." In so holding we are not unmindful of the decisions above cited to the contrary. However, in construing our State Constitution, we are not bound by the decisions from other jurisdictions or those of the United States Supreme Court construing the Federal Constitution. See: *In re Assessment of Kanawha Valley Bank,* 144 W. Va. 346, 109 S. E. 2d 649.

The judgment of the Circuit Court of Fayette County, entered April 24, 1964, is affirmed.

*Affirmed.*